**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

General Electric Capital Corporation,                          Civil No. 11-1139 (SRN/TNL)
a Delaware corporation,

                Plaintiff,                          **MEMORANDUM OPINION**
                                            **AND ORDER**

    v.

Brooklyn Printing & Advertising Co.,
Inc., a Minnesota corporation; Daniel F.
Mus; and Christine L. Mus,

                Defendants.

---

Paul L. Ratelle, Fabyanske, Westra & Hart, P.A., 800 LaSalle Ave., Suite 1900, Minneapolis, MN 55402; and Aaron B. Chapin, Reed Smith LLP, 10 South Wacker Drive, Chicago, IL 60606-7507, for Plaintiff.

Daniel P. H. Reiff, Reiff Law Office, PLLC, 2355 Fairview Ave. N., # 124, St. Paul, MN 55113, for Defendants.

---

SUSAN RICHARD NELSON, United States District Judge

      This matter is before the Court on Plaintiff General Electric Capital Corporation's motion for replevin (Doc. No. 10), its motion to dismiss Defendants' counterclaims (Doc. No. 7), and Defendants' motion for summary judgment (Doc. No. 18).  For the reasons stated below, this Court grants the motion for replevin, grants the motion to dismiss the counterclaims, and denies the motion for summary judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

      In August 2001, Defendant Brooklyn Printing & Advertising Co. leased a Komori Lithrone Model L428-III, Series 2815 Printing Press ("the 28 Inch Press") from Heller

Financial Leasing, Inc.  (Doc. No. 35, Ex. 1.)  The lease included an option for Brooklyn to purchase the press under certain specified terms.  (Id.)  On August 20, 2001, Heller filed a UCC Financing Statement reflecting a security interest in all of Brooklyn's personal property.  (Doc. No. 35-6.)  GE Capital later acquired Heller and its rights as lessor of the 28 Inch Press.  (Doc. No. 35, ¶ 9.)  The lease was assigned number 2150704-002.

In March 2005, Brooklyn leased a Komori Lithrone Model LS440 Series 4015 printing press ("the 40 inch press") from GE Capital.  (Doc. No. 24, Ex. A.)  The lease included an option for Brooklyn to purchase the press under stated terms.  (Id.)  GE Capital filed a UCC Financing Statement identifying the 40 Inch Press as collateral. (Doc. No. 24, Ex. D.)  The lease was assigned number 4338090-001.  Brooklyn also signed a Chattel Mortgage Security Agreement granting GE Capital a security interest in its personal property.  (Doc. No. 35, Ex. B.)  GE Capital filed a UCC Financing Statement to that effect.  (Id., Ex. D.)  In addition, Brooklyn entered into a Cross-Collateral and Cross-Default Agreement with GE Capital.  (Id., Ex. C.)  Finally, Defendants Daniel and Christine Mus, husband and wife, signed a Personal Guaranty agreeing to "jointly and severally, unconditionally guaranty" to GE Capital the prompt performance by Brooklyn of all its contractual obligations with GE Capital.  (Doc. No. 24, Ex. E.)

In late 2007, Brooklyn sought to refinance its obligations to GE Capital by borrowing funds from Bremer Bank.  On December 7, 2007, Bremer requested payoff information from GE Capital but stated that Bremer would "transmit these funds to GEC

only upon GEC's agreement" to, among other requirements, "release of all of GEC's security interests in any collateral for [Brooklyn's] now existing or hereafter arising obligations to GEC including, without limitation, GEC's security interest in [Brooklyn's] assets . . . ." (Doc. No. 38, Ex. B.)  The December 7, 2007 letter referenced "Account # 4338090-002," and requested that GE indicate its "acceptance of these conditions to wire transfer of the above described pay-off amount." (Doc. No. 38, Ex. B.)  The letter did not, however, disclose the pay-off amount, providing only a blank line for that figure. The letter was signed by Bremer and by Daniel Mus on behalf of Brooklyn.  (Id.)  Space was provided for a signature by a representative of GE Capital to accept and agree to the proposal.  (Id.)  There is no evidence that GE Capital accepted Brooklyn's offer by signing and returning the letter.

GE Capital states that it "never accepted the terms of Bremer Bank's payoff letter." (Doc. No. 35, ¶ 23.)  Rather, "[o]n January 15, 2008, by Defendants' request GE Capital issued a payoff letters [sic] to Brooklyn for Account Nos. 2150704-002" (and two other small accounts not at issue here).  (Id. ¶ 24.)  The amount of the pay-off for the 28 Inch Press was $755,266.06.  (Id. ¶ 24 & Ex. 7.)  On January 30, 2008, GE Capital received a wire transfer in the amount of $755,266.06, referencing "Lease #2150704-002," that is, the lease for the 28 Inch Press.  (Id. ¶ 35, Ex. 3, at 8.)

On February 1, 2008, GE Capital sent Bremer a letter regarding "[a]ccount 2150704002," stating that "[f]or value received, GE CAPITAL hereby sells, transfers, and otherwise assigns to the above named purchaser . . . all of GE CAPITAL's rights, title

and interest in and to the following personal property": "Komori L428-III SERIES 15 WITH [sic]." (Doc. No. 35, Ex. 2.) Accordingly, GE Capital asserts that Brooklyn purchased the 28 Inch Press in January 2008. (Doc. No. 35, ¶ 11.)

Brooklyn, however, contends that GE Capital never provided Brooklyn with a valid and effective "Bill of Sale" for the 28 Inch Press. (Doc. No. 29, ¶¶ 2-3.) John House, the General Manager of Brooklyn, states that, to the best of his knowledge, he never saw the February 1, 2008 purported Bill of Sale until this litigation. (Doc. No. 28, ¶ 7.) Daniel Mus asserts that "[e]ven if Brooklyn" had in fact received that document, it "does not convey good title to the press it attempts to describe for several reasons, including that (1) the stated name of the purported purchaser, "'Brooklyn Printing & Advertis' is not correct and [his company has] never operated under that name"; (2) "[t]he general description of the press as a 'Komori L-428-III' is incorrect"; and (3) "[t]he description of the press does not include the serial number, which is on both the machine and all the manuals for the machine." (Doc. No. 29, ¶ 4.) House asserts that "it is standard in the industry to include the Serial Number when selling used printing equipment." (Doc. No. 28, ¶ 12.) Mus also asserts that he has "never heard of, communicated with, or spoken with Jolene Kaiser," who signed the February 1, 2008 letter on behalf of GE Capital. (Doc. No. 29, ¶ 6.)

GE Capital asserts that "[f]ollowing the January 2008 Transaction, Brooklyn discontinued making payments on Account No. 2150704-002 for the 28 Inch Press," but "continued to make payment to GE Capital under Account No. 4338090-001" until

November 2009.  (Doc. No. 35, ¶¶ 31-33.)  Defendants concede that "[a]fter submitting the $755,266.06 wire transfer, Brooklyn Printing continued to pay all the invoices Plaintiff sent it."  (Doc. No. 37, at 2.)

Based on Brooklyn's financial difficulties, the parties then agreed to modify some of the terms of the lease.  In February 2010, Brooklyn and GE Capital entered into a "Modification Agreement," noting that they "are parties to that certain Equipment Lease Agreement No. 4338090-001 dated as of March 25, 2005."  (Doc. No. 35, Ex. F.)  The agreement essentially modified the remaining schedule of payments, giving Brooklyn some breathing room.  Pursuant to that agreement, Brooklyn made payments "for Lease No. 4338090-001" between February 26, 2010 and March 1, 2011.  (Doc. No. 29, ¶ 14 & Ex. B.)

Since then, however, Brooklyn has failed to make its scheduled payments, according to GE Capital.  (Doc. No. 24, ¶¶ 10, 11.)  An e-mail dated March 24, 2011, from Russell Butts of GE Capital informed Brooklyn that GE Capital had "declined your request for further restructure of the payment terms of your equipment lease."  (Doc. No. 21, Ex. D.)  By letters dated March 29, 2011, GE Capital demanded that Defendants cure their default.  (Doc. No. 24, ¶ 15.)  GE Capital claims that Brooklyn owes it, as of March 29, 2011, not less than $841,852.58.  (Id., ¶ 20.)

In the interim, however, "Brooklyn requested a payoff figure, which GE Capital provided by letter dated March 28, 2011."  (Id. ¶ 17.)  GE Capital offered Brooklyn "the opportunity to purchase" the 40 Inch Press for a total of $914,500.98, including sales tax.

(Doc. No. 35, Ex. 3.)

By letter dated April 7, 2011, Brooklyn sent GE Capital a check in the amount of $15,734.44.  (Doc. No. 21, Ex. G.)  The letter states that Daniel Mus has "decided to payoff the above referenced Lease per your quote of $914,500.98" by "[a]pplication of the $755,266.06 wired to" GE Capital on January 30, 2008, plus six percent interest on that amount, that is, $143,500.54, plus the check for $15,734.44.  (Id.)  The face of the check includes a handwritten notation stating "pd. In full / Lease Agreement 4338090-001."  (Doc. No. 21, Ex. H.)

GE Capital concedes that it "negotiated" the check for $15,734.44, but contends that as a matter of course all correspondence it receives is "opened by mailroom staff, and payments of any sort detached from the correspondences and processed independently and automatically."  (Doc. No. 35, ¶ 48.)  It further asserts that "neither Rhonda Estling nor Amy Dunbar [two GE Capital employees who had corresponded with Brooklyn], received the instrument or authorized GE Capital to negotiate it."  (Id.)   GE Capital thus asserts that it "did not accept the $15,734.44 in satisfaction of the amount owing under Account No. 4338090-001."  (Id. ¶ 50.)

Moreover, by letter dated April 15, 2011, GE Capital's counsel notified Brooklyn that it had "failed to cure the default under the Lease as set forth in the [March 29, 2011] Demand Letters.  Accordingly, all amounts owed to GE Capital under the Lease are immediately due and payable."  (Doc. No. 35, Ex. 4.)  The letter also expressly informed Brooklyn that "[t]he partial payment of $15,734.44 provided by Brooklyn on April 7,

2011 will be credited to the amounts due as set forth in the Demand Letters." (<u>Id.</u>)

In response to Brooklyn's position that it had paid off in full the amount owing on the 40 Inch Press, via an accord and satisfaction, "GE Capital tendered back to Brooklyn a check in the amount of $15,734.44 on June 17, 2011." (Doc. No. 24, ¶ 21.)  GE Capital noted that it was tendering the check "[p]ursuant to section 3-311(c)(2) of the" UCC. (Doc. No. 24, ¶ 21.)  That section provides that an accord and satisfaction by use of a negotiable instrument is not established if the "claimant tenders repayment of the amount of the instrument" "within 90 days after payment of the instrument." <u>E.g.</u> Minn. Stat. § 336.3-311(c)(2).  "Brooklyn received the check and mailed it back to GE Capital shortly thereafter." (Doc. No. 24, ¶ 21.)  In returning the check to GE Capital, Brooklyn asserted that GE Capital does "not have the right to undo our 'accord and satisfaction' by returning our check which was accepted by the designated person, office and place." (Doc. No. 21, Ex. J.)

Accordingly, GE Capital filed this action on May 2, 2011, asserting a claim for replevin, a claim for breach of contract by Brooklyn, and a claim for breach of contract by the guarantors, Daniel and Christine Mus.  (Doc. No. 1.)  Defendants' Answer included counterclaims for (1) damages under Minn. Stat. § 507.41, (2) slander of title, and (3) injunctive relief and damages under the Equal Credit Opportunity Act.  (Doc. No. 5.)

GE now moves to dismiss the counterclaims.  (Doc. No. 7.)  GE also moves for an order of replevin.  (Doc. No. 10.)  Finally, Brooklyn moves for summary judgment. (Doc. No. 18.)

## II.    DISCUSSION

The three motions before the Court largely address the same issue–that is, whether Brooklyn purchased either (or both) of the two printing presses–with the partial exception of Plaintiff's motion to dismiss Defendants' counterclaims, one of which is somewhat tangential to the main dispute.  Therefore, the Court will address the replevin motion and the summary judgment motion together.

### A.    Summary Judgment And Replevin Standards

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Here, not only does GE Capital oppose Defendants' motion for summary judgment, it expressly requests this Court to enter summary judgment in its favor.  (Doc. No. 34, at 1 & 5.)  The issues having been thoroughly briefed and supported with affidavits and documentary evidence, the Court finds no need to provide Defendants with the "notice and a reasonable time to respond" that they would be entitled to under Rule 56(f)(1) had the basis for GE Capital's request for summary judgment not been essentially coincident with its motion for replevin and the mirror image of Defendants' motion.[1]

---

[1]     Under Minnesota state law, "the court shall order seizure of the property from respondent and delivery to claimant if claimant has demonstrated the probability of success on the merits entitling claimant to possession of the property and upon compliance with the bonding requirements set forth in section 565.25, subdivision 1, unless the court makes" certain findings warranting respondent's retention of possession of the property pending a final decision on the merits.  Minn. Stat. § 565.25, subds. 3, 4. Insofar as this Court grants summary judgment in favor of GE Capital, it would plainly

continue...

### B.    Ownership Of The Two Printing Presses

A chronological review of the communications between the parties and of the documentary evidence of the sequence of transactions is essentially determinative here. Defendants somehow insist that it is clear that their December 2007 payoff request, in conjunction with Plaintiff's response, establishes that they purchased the 40 Inch Press. Defendants premise this argument on the fact that their December 2007 letter to GE Capital referenced the loan number for the 40 Inch Press.  But that letter was simply an offer, albeit one lacking an essential term, the amount of the payoff, a figure that would identify which press Brooklyn sought to purchase.

Moreover, GE Capital did not accept that offer, as indicated by the lack of any signature on its behalf.  Instead of accepting that "offer," GE Capital's response was an offer (or perhaps a counter-offer) for Defendants to purchase the 28 Inch Press.  This counter-offer included the necessary terms:  (1) the lease number associated with the 28 Inch Press, and (2) the purchase price.  Defendants accepted this offer by sending the stated purchase price via wire transfer.  GE Capital then purportedly sent Brooklyn a letter documenting the sale and transferring title.

Brooklyn disputes ever receiving that February 1, 2008 letter, and, in any event, also contests its legal sufficiency as a "Bill of Sale," arguing that it never received good title to the 28 Inch Press.  (Doc. No. 37, at 9-10 & n.1 ("[B]ut for purposes of this motion, it will act as if the letter was received.").)  Such objections are essentially irrelevant.

---

[1]...continue
satisfy the standard for issuing an order of replevin under state law.

Defendants rely on two non-controlling cases, one from 1933 and the other from 1942, for the proposition that "if a serial number exists, then it must be included on the bill of sale in order for title to pass." (Id. at 10.) But those cases pre-date the UCC. "Passing of title" is now governed by Section 2-401 of the UCC, which does not premise the passing of title on inclusion of any serial numbers. Minn. Stat. § 336.2-401. The contract for sale was consummated when Brooklyn wire transferred the payment in full to GE Capital according to the terms of GE Capital's offer. That all parties understood that Brooklyn had in fact purchased the 28 Inch Press is confirmed by the fact that Brooklyn no longer made periodic lease payments on that account.

Daniel Mus states that "[i]t was [his] understanding, . . . that [Bremer's proposal] was agreeable to GEC, and Bremer Bank sent a wire transfer in the amount of $755,266.06 pursuant to the terms of the December 7, 2007, letter." (Doc. No. 21, ¶ 7.) As Mus also states, "[o]n January 30, 2008, the Bremer Bank, believing there was an agreement on the terms of the purchases, wired GE Capital the pay-off amounts for the press" and other equipment. (Doc. No. 38, ¶ 10.) Mus' purported "understanding" that GE Capital understood and agreed to the terms of the December 7, 2007 pay-off proposal as applying to the 40 Inch Press is simply unfounded. Defendants point to no documentary evidence, or any relevant evidence at all, that GE Capital accepted the terms of Brooklyn's December 2007 offer. No reasonable juror could agree with Mus' position–based only his asserted "understanding"–that GE Capital could have understood and agreed to Brooklyn's purported position where (1) GE Capital did not sign and return

the proposal, (2) that proposal provided no pay-off amount that could identity the 40 Inch Press and differentiate it from the 28 Inch Press, and (3) Brooklyn's subsequent actions–most importantly, continuing to make payments on the 40 Inch Press and acknowledging its obligations as lessee of that press in the 2010 Modification Agreement–confirmed that Brooklyn bought the 28 Inch Press, not the 40 Inch Press.

Defendants persist in arguing that GE Capital accepted the terms of Brooklyn's December 7, 2007 offer, invoking Section 2-207 of the UCC, which governs terms of an acceptance that vary from those of the offer.  (Doc. No. 37, at 11.)  But GE Capital's January 15, 2008 letter was not an acceptance of Brooklyn's December 7, 2008 offer. "Not all return documents are 2-207(1) 'acceptances.'"  1 White & Summers, Uniform Commercial Code §1-3, at 79 (5th ed. 2006).  GE Capital had rejected that offer.[2]  And its January 2008 letter, which does not purport to suggest changes to, much less even mention, Brooklyn's December 7, 2007 offer, was itself an offer.  (Doc. No. 35, Ex. 7 ("GE CAPITAL is pleased to be able to offer your company the opportunity to purchase the equipment associated with" lease number 2150704).)  Brooklyn accepted this offer by sending the wire transfer for the amount GE Capital had identified as the purchase price and indicating the payment was for the lease number for the 28 Inch Press.  E.g., Minn. Stat. § 336.2-206(1)(a) (stating that an offer generally invites acceptance in any reasonable manner).

---

[2]      By providing a space for GE Capital to indicate its acceptance of Brooklyn's offer that stated "[a]ccepted and agreed to this __ day of _____, 2007," it appears that Brooklyn's offer was only open through the end of 2007.

Brooklyn concedes that it continued to make periodic lease payments on the 40 Inch Press through late 2009, when it was forced to renegotiate the terms of that lease. Moreover, the resulting Modification Agreement itself confirmed that Brooklyn could not have purchased the 40 Inch Press in January 2008, as that agreement again noted the new payment terms on the lease number associated with the 40 Inch Press.

Defendants now assert, however, that "[a]t the time Dan Mus executed the Modification Agreement, he did so in the belief that GE was going to comply with the terms of the [December 2007] pay off letter and provide Brooklyn Printing with a Bill of Sale, lien release and release of the guarantors." (Doc. No. 27, at 4; Doc. No. 29, ¶ 10.) Again, any belief that Brooklyn had purchased the 40 Inch Press in January 2008 is untenable in light of the documentary facts.

Brooklyn then continued making payments under the Modification Agreement until it again encountered financial difficulties in late 2010. The resulting exchange of correspondence between the parties leaves no room for doubt that the only outstanding lease between them pertained to the 40 Inch Press. GE Capital's March 2011 pay-off offer identifies the lease number for the 40 Inch Press and specifies the pay-off amount.

In support of its position that it purchased the 40 Inch Press in April 2011, Brooklyn relies largely on the fact GE Capital "negotiated" (cashed) the check for $15,734.44 that Brooklyn had tendered with the notation "pd. In full / Lease Agreement 4338090-001." Brooklyn adheres to the position that by cashing the check, GE Capital agreed to this accord and accepted Brooklyn's satisfaction of the newly-substituted

performance for its prior obligation under the Modification Agreement.

But there was no "accord" that could be satisfied by cashing Brooklyn's check. An accord and satisfaction is a substituted–and usually compromised–performance for an existing contractual obligation.  <u>Webb Bus. Promotions, Inc. v. American Elec. & Entm't Corp.</u>, 617 N.W.2d 67, 73 (Minn. 2000) ("An accord is a contract in which a debtor offers a sum of money, or some other stated performance, in exchange for which a creditor promises to accept the performance in lieu of the original debt.  The satisfaction is the performance of the accord, generally the acceptance of money, which operates to discharge the debtor's duty as agreed to in the accord.")

> An enforceable accord and satisfaction arises when a party against whom a claim of breach of contract is asserted proves that (1) the party, in good faith, tendered an instrument to the claimant as full satisfaction of the claim; (2) the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim; (3) the amount of the claim was unliquidated or subject to a bona fide dispute; and (4) the claimant obtained payment of the instrument.

<u>Id.</u> at 73.

Here, however, Brooklyn owed a remaining amount under the existing terms of the lease as provided in the Modification Agreement.  But when requesting a pay-off amount, Brooklyn did not offer any substituted, compromised performance.  It simply inquired as to the amount under the then existing agreement sufficient to exercise its purchase option. GE Capital provided that amount–$914,500.98.  In short, Brooklyn did not offer a lesser sum as a compromised substituted performance to satisfy the pay-off amount, for example, $15,734.44 to satisfy the outstanding pay-off balance of $914,500.98.  Rather,

Brooklyn agreed to pay the stated pay-off amount–"I have decided to payoff the above referenced Lease per your quote of $914,500.98."[3]  In short, the parties did not agree on any substituted, compromised performance of Brooklyn's lease obligations.[4]

But Brooklyn then unilaterally attempted to do so via three components:  (1) redirecting or reallocating to the account for the 40 Inch Press the $755,266.06 it had paid in January 2008 for the 28 Inch Press, (2) adding $143,500.54 as interest on that amount for the period between January 2008 to April 2011, and (3) sending a check for the remaining balance due in the amount of $15,734.44.  But, of course, Brooklyn lacked the

---

[3]     Defendants argue that the amount owed was unliquidated or that there was a bona fide dispute as to its contractual obligations because Brooklyn had received correspondence from two different people at GE Capital, each stating a different pay-off amount.  But Rhonda Estling's March 29, 2011 notice of default simply states that "[u]pon acceleration [of the debt if Brooklyn would not pay the past due amount within 10 days], $841,852.58 shall be immediately due and payable . . . plus any applicable fees, costs and expenses owed or owing."  (Doc. No. 21, Ex. F.)  Amy Dunbar's March 28, 2011 pay-off offer provides that Brooklyn may purchase the 40 Inch Press for $852,867.76 plus $61,633.22 in sales taxes for a total of $914,500.98.  (Doc. No. 35, Ex. 3.)  It is not clear that the two figures purport to reflect the same amount.  Even if the two figures do purport to refer to the same amount, nevertheless there was no unliquidated amount owed or *bona fide* dispute regarding the debt.  First, the discrepancy results from figures provided by different people at GE Capital, not from disparate amounts asserted by GE Capital and Brooklyn.  Second, Brooklyn responded to both Estling and Dunbar, not by disputing either of the figures provided by GE Capital, but by *agreeing* "to payoff the above referenced Lease per your quote of $914,500.98," which, moreover, reflects the *higher* of the two figures provided by GE Capital.  (Id.)

[4]     Defendants argue that the option to purchase was conditioned on several requirements that were not met here.  (Doc. No. 27, at 5; Doc. No. 29, ¶ 17.)  But those conditions applied to a particular option Brooklyn enjoyed, that is, one that it could invoke unilaterally if the conditions were met.  (Doc. No. 24, Ex. A, § 22 (providing that if conditions are met, Brooklyn "may elect to purchase" the 40 Inch Press).)  That conditional option does not preclude GE Capital from offering Brooklyn the opportunity to purchase the press independent of those conditions, which favored GE Capital.

authority to reallocate funds previously paid under another lease account to that of the 40 Inch Press, much less to assume that GE Capital had simply held such funds in some sort of interest-earning escrow account that Brooklyn could also tap for some $143,500.54 in additional payments it purportedly already had made.  Thus, Brooklyn–which concedes it no longer made lease payments for the 28 Inch Press after the January 2008 transaction–could not have tendered the check for $15,734.44 in good faith as satisfying an alleged accord that purported to apply the funds previously spent purchasing the 28 Inch Press to the "accord" regarding the 40 Inch Press.

Even if Brooklyn had some option to switch payments between those accounts, shifting the payment it made in January 2008 for the 28 Inch Press to the account for the 40 Inch Press would necessarily undo the sale of the 28 Inch Press so as to render Brooklyn obligated to resume lease payments on the smaller press.  Moreover, due to the fact that Brooklyn would not have made lease payments on the 28 Inch Press for over three years, it presumably would be in default under that lease unless it could somehow also pay sufficient funds in April 2011 to restore that account to balance (which presumably would be not just the outstanding periodic lease payments but also any applicable late fees, etc.).

### C.    Liens and UCC Financing Statements

Finally, Defendants press the issue of the liens on Brooklyn's property and the personal guaranties by Daniel and Christine Mus that Defendants argue GE Capital failed to release upon Brooklyn's purchase of the press.  Here, in light of this Court's decision

that Brooklyn purchased the 28 Inch Press rather than the 40 Inch Press, there can be no issue of whether GE Capital was obligated to release any security interests it has with respect to Brooklyn's outstanding debt on the 40 Inch Press, or any guaranty of Brooklyn's obligations with respect to that press.

Regarding the 28 Inch Press, GE Capital notes that it's January 15, 2008 offer for Brooklyn to purchase the 28 Inch Press said nothing about releasing the liens. (Doc. No. 34, at 9.) As discussed above, Brooklyn accepted that offer by paying the stated price via wire transfer. Brooklyn, however, argues that GE Capital "had a duty imposed by statute to release the liens," contending that Section 9-513 of the UCC is "clear that Plaintiff must release its liens once the obligation has been satisfied." (Doc. No. 37, at 13.) Insofar as it could be relevant here, Section 9-513 provides that, with respect to collateral other than consumer goods, within 20 days after a demand by a debtor, the secured party shall terminate a financing statement if, among other things, "the financing statement covers accounts or chattel paper that has been sold but as to which the account debtor or other person obligated has discharged its obligation." Minn. Stat. § 336.9-513.

But in any event, when Brooklyn leased the 40 Inch Press in March 2005, it also signed the Chattel Mortgage Security Agreement. (Doc. No. 24, Ex. B.) That agreement grants "to General Electric Capital Corporation . . . a security interest in and mortgages to Secured Party the following": all of Brooklyn's "goods and personal property now owned *or hereafter acquired*, . . . including . . . fixtures, machinery [and] equipment." (Id. (emphasis added).) Thus the UCC financing statements regarding the 28 Inch Press

presumably would not have to be withdrawn or removed because the lien to secure the

payments on the 40 Inch Press would have extended to the 28 Inch Press immediately

upon Brooklyn's purchase of that smaller press in January 2008.  Similarly, Brooklyn

also signed in March 2005 a Cross-Collateral and Cross-Default Agreement under which

Brooklyn agreed that

> [a]ll presently existing and *hereafter acquired* personal property of Debtor in which GE Capital has or shall have a security interest, or retained title thereto, shall secure the payment and performance of all Debtor's liabilities and obligations to GE Capital of every kind and character, whether joint or several, direct or indirect, absolute or contingent, due or to become due, and whether under presently existing or hereafter created Agreements, or otherwise.
>
> Debtor further agrees that GE Capital's security interest in or title to the Collateral covered by any Agreement now held or hereafter acquired by GE Capital *shall not be terminated in whole or in part until and unless all indebtedness of every kind, due or to become due, owed by Debtor to GE Capital is fully paid and satisfied and the terms of every Agreement have been fully performed by Debtor.*  It is further agreed that GE Capital is to retain GE Capital's security interest in or title to all of the Collateral covered by all of the Agreements held or acquired by GE Capital, as security for the payment and performance under each such Agreement notwithstanding the fact that one or more of such Agreements may become fully paid.

(Doc. No. 24, Ex. C (emphases added).)[5]  In short, GE Capital retained a security interest

in and lien on the 28 Inch Press after it sold that press to Brooklyn by virtue of the press

changing from the good leased to personal property acquired after the parties entered into

the first lease, but Brooklyn remained obligated under the lease of the 40 Inch Press.

---

[5]     Any priority dispute between GE Capital and Bremer Bank as a result of the January 2008 sale of the 28 Inch Press is not part of this action.

### D.     Counterclaims

This leaves only Defendants' counterclaims, for which GE Capital seeks dismissal

with prejudice.  (Doc. No. 7, at 2; Doc. No. 26, at 2, 23.)  On a motion to dismiss, the

Court accepts as true the factual allegations of a complaint and draws all reasonable

inferences in a plaintiff's favor, but it does not defer to any legal conclusions or formulaic

recitations of the claims' elements.  Minneapolis Firefighter Relief Ass'n v. MEMC

Electronic Materials, Inc., 641 F.3d 1023, 1027 (8th Cir. 2011).  Under Rule 12(b)(6), the

Complaint "'must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 129 S.

Ct. 1937, 1949 (2009)).  This standard also applies, of course, where a plaintiff seeks, on

a Rule 12 motion, to dismiss a defendant's counterclaims.

### 1.     Section 507.41

With respect to Defendants' first cause of action, Defendants seek damages under

Minnesota Statute 507.41 for GE Capital's alleged failure to timely discharge the

"mortgage" on the 40 Inch Press.  Section 507.41 provides that a "mortgagee shall be

liable to the mortgagor . . . for all actual damages" occasioned by the mortgagee's failure

to timely discharge a mortgage "upon full performance of the conditions of the

mortgage."  Minn. Stat. § 507.41.

The parties approach the issue under the assumption that Brooklyn purchased the

40 Inch Press.  GE Capital argues that this statute is plainly confined to

mortgages–security interests in real property.  Brooklyn, however, contends that "[t]he

statute does not explicitly state such a limitation." (Doc. No. 31, at 6.) Section 507.41 appears to be confined to real property. The Court need not, however, decide that issue because the Court has concluded that Brooklyn did not purchase the 40 Inch Press. As Brooklyn has not discharged its obligations under the lease governing the 40 Inch Press, Section 507.41 does not apply here as a matter of law.

### 2.    Slander of Title

In part for similar reasons, the Court may readily dispose of Defendants' second cause of action, slander of title. Defendants allege that "Plaintiff has asserted that it has a valid lien claim against the 40 inch Komori Press," but that such a claim is false, as Plaintiff knows. (Doc. No. 5, ¶¶ 72, 73.) Defendants further allege that "Plaintiff has communicated this false claim by filing a UCC Financing Statement . . . and has failed to remove the lien claim upon demand." (Id., ¶ 74.)

To establish slander of title, a claimant must establish (1) that there was a false statement concerning the *real property* owned by plaintiff; (2) that the false statement was published to others; (3) that the false statement was published maliciously; and (4) that the publication caused the plaintiff pecuniary loss in the form of special damages. Paidar v. Hughes, 615 N.W.2d 276, 279-80 (Minn. 2000). Here, Defendants' counterclaim presumes that Brooklyn now owns the 40 Inch Press. As discussed above, the Court has rejected that position. Accordingly, this counterclaim too is dismissed with prejudice.

### 3.      Equal Credit Opportunity Act

Finally, Defendants' third cause of action alleges a violation of the Equal Credit

Opportunity Act (ECOA) with respect to Defendant Christine Mus.  Defendants allege

that the March 25, 2005 Personal Guaranty and the reaffirmation of the guaranty in the

2010 Modification Agreement violates the ECOA and Regulation B because Christine

Mus has no ownership interest in Brooklyn Printing and GE Capital required her guaranty

"merely on the basis of her marital status" as the wife of Defendant Dan Mus, Brooklyn's

owner.  (Doc. No. 5, ¶ 79 at 21.)

Under the ECOA's prohibitory provision, "[i]t shall be unlawful for any creditor to

discriminate against any applicant, with respect to any aspect of a credit transaction" on

the basis of, as relevant here, "sex or marital status."  15 U.S.C. § 1691(a).  To establish a

*prima facie* case under the ECOA, a claimant

> must demonstrate that (1) she was a member of a protected class, (2) she
> applied for and was qualified for a loan with the Bank, (3) the loan was
> rejected despite her qualifications, and (4) the Bank continued to approve
> loans for applicants with similar qualifications.

Rowe v. Union Planters Bank of Southeast Missouri, 289 F.3d 533, 535 (8th Cir. 2002).

Here, of course, Christine Mus did not apply for any loan, nor was any loan

rejected despite her qualifications.  Rather, Christine Mus only guaranteed the obligations

of Brooklyn.  (Doc. No. 24, Ex. E.)  And here, the guaranty expressly provided that

"[a]ny married person who signs this Guaranty hereby expressly agrees that recourse may

be had against *his or her* separate property for all obligations under this Guaranty."  (Doc.

No. 24, Ex. E (emphasis added).)  It is thus difficult to understand how GE Capital could

have discriminated against Christine Mus by extending–not denying–credit to her

husband's company and requiring her only to jointly guarantee that debt.  Thus, "[a]t first

blush, the [ECOA] has no relevance to this case":

> So far as the prohibition against discrimination on the basis of marriage is
> concerned . . ., it is apparent that what the Act was intended to do was to
> forbid a creditor to deny credit to a woman on the basis of a belief that she
> would not be a good credit risk because she would be distracted by
> childcare or some other stereotypically female responsibility.

Moran Foods, Inc. v. Mid-Atlantic Mkt. Dev. Co., LLC, 476 F.3d 436, 441 (7th Cir. 2007)

(Posner, J.).

Nevertheless, Christine Mus purports to premise her ECOA claim on one of the

implementing regulations:

> [e]xcept as provided in this paragraph, a creditor shall not require the
> signature of an applicant's spouse or other person, other than a joint
> applicant, on any credit instrument *if the applicant qualifies under the
> creditor's standards of creditworthiness* for the amount and terms of the
> credit requested.

12 C.F.R. § 202.7(1) (emphasis added).  The regulations also define "'applicant' for

credit (the term in the statute) to include a guarantor."  Moran Foods, 476 F.3d at 441; 12

C.F.R. § 202.2(e).  But as the Seventh Circuit has noted, it "doubt[s] that the statute can

be stretched far enough to allow this [regulatory] interpretation."  Moran Foods, 476 F.3d

at 441.  In addition to the fact that "there is nothing ambiguous about 'applicant' and no

way to confuse an applicant with a guarantor," "to interpret 'applicant' as embracing

'guarantor' opens vistas of liability that the Congress that enacted the Act would have

been unlikely to accept."  Id.

But even assuming that Section 202.7 is a valid regulation within the statutory parameters of the ECOA, Christine Mus has failed to allege a prima facie claim for a violation of Section 202.7(d)(1).  Defendants have failed to allege that the applicant qualified under the creditor's standards of creditworthiness.  Defendants nevertheless argue that at this juncture, before GE Capital has provided discovery, it is impossible to determine whether "Daniel Mus and Brooklyn would qualify for the loan on their own" under GE Capital's standards.  (Doc. No. 31, at 13.)[6]  But even assuming that GE Capital has not provided the relevant discovery, Daniel and Christine Mus themselves would know what financial records GE Capital required them to provide to GE Capital to evaluate their creditworthiness.

Defendants further argue that Christine Mus is not employed outside the home, does not own any part of Brooklyn and does not have any substantial assets, such that "it is difficult to see why her guarantee would add anything to the creditworthiness of" her husband and his business.  (Doc. No. 31, at 13.)  Although the Court will accept as true Defendants' allegation in their Answer and Counterclaim that Christine Mus "had no ownership interest in" Brooklyn (Doc. No. 5, ¶¶ 7, 8), they direct this Court to no

_____

[6]     Even if the Court accepts the regulation on its own terms, the prohibition against requiring "the signature of an *applicant's spouse*" is conditioned on the fact that the "*applicant* qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested." 12 C.F.R. § 202.7(d).  Here–as Defendants concede (Doc. No. 5, ¶ 78)–the "applicant" was Brooklyn, not Daniel Mus, and Christine Mus is obviously not the wife of Brooklyn.  And the fact that the regulation defines "applicant" to include a "guarantor" does not salvage Defendants' counterclaim.  Insofar as Daniel Mus, as one of the guarantors, is thus an "applicant" under the regulation, the creditworthiness of Christine Mus is still a relevant and valid inquiry for the creditor.

evidentiary support for the remainder of this assertion.  Defendants do not even allege, much less substantiate with any evidence, that any financial statements GE Capital required indicate that Christine Mus held no jointly-owned assets with her husband.

In particular, they do not disavow that Christine Mus held any interest in the Brooklyn Park residence she presumably shared with her husband.  (Doc. No. 24, Ex. E (indicating Daniel and Christine each resided in Brooklyn Park, MN).)[7]  And as Judge Posner noted in <u>Moran Foods</u>, if a lender recognizes that a borrower lives with their spouse, it is "sound commercial practice unrelated to any stereotypical view of the wife's role" to require a woman living with the borrower to insist that the woman also guarantee the debt without any "discrimination on the basis of marital status."  476 F.3d at 442 (noting likelihood of joint ownership of assets such as a house).

In sum, all three counterclaims are dismissed with prejudice.

## III.   CONCLUSION

In conclusion, Brooklyn now owns the 28 Inch Press, but is in default on the 40 Inch Press.  In light of the parties' confusion or miscommunication regarding the events since January 2008, the Court will stay this ruling for thirty days to allow the parties to work-out a possible agreement to avoid replevin of the 40 Inch Press, and the severe consequences that Brooklyn asserts would occur upon GE Capital's repossession of that press.  In addition, GE Capital shall, within seven days of the date of this Order send to

---

[7]     By the time the action was filed in 2011, Daniel and Christine Mus resided at the same residence in Andover, Minnesota.  (Doc. No. 5, ¶ 2 (expressly admitting allegations of common residence).)

Brooklyn a document entitled "Bill of Sale" regarding the 28 Inch Press that assuages

Brooklyn's concerns regarding the description of the purchaser and the identification of

the property purchased.  Brooklyn, if it chooses not to default on the lease for the 40 Inch

Press, shall seek financing from a third-party or negotiate a modification of its

outstanding obligations to GE Capital under the current lease for the 40 Inch Press.  If

Brooklyn is unable to cure its default and resume payments, the Court shall issue an

Order for Replevin in favor of GE Capital and direct that judgment in favor of GE Capital

be entered.

## IV.    ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.     Defendants' motion for summary judgment (Doc. No. 18) is **DENIED**;

2.     Plaintiff's motion for replevin (Doc. No. 10), is **GRANTED**;

3.     Plaintiff's motion to dismiss Defendants' counterclaims (Doc. No. 7) is

**GRANTED**;

4.     Plaintiff is entitled to **SUMMARY JUDGMENT**; and

5.     The Order for Replevin and Summary Judgment in favor of GE Capital is

hereby **STAYED** for thirty days from the date of this Order pending the parties' ability to

resolve Brooklyn's current default on the 40 Inch Press.


Dated:   March 28, 2012                              __s/ Susan Richard Nelson___
                                                     SUSAN RICHARD NELSON
                                                     United States District Judge